**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| In re | Chapter 11 |
| **THE CULTURE PROJECT, INC.,** | Case No. 16-11874 (MEW) |
| Debtor. | |
| **THE CULTURE PROJECT, INC.,** | |
| Plaintiff, | |
| v. | Adv. Pro. No. 16-1194 (MEW) |
| **THE BERTHA FOUNDATION and SUBCULTURE, LLC,** | |
| Defendants. | |

**MEMORANDUM DECISION REGARDING (I) MOTION BY SUBCULTURE, LLC FOR PARTIAL DISMISSAL OF THE AMENDED COMPLAINT AND (II) MOTION BY THE CULTURE PROJECT, INC. TO COMPEL USE AND OCCUPANCY PAYMENTS OR, ALTERNATIVELY, FOR PERMISSION TO REJECT A SUBLEASE**

A P P E A R A N C E S:

SHAFFERMAN & FELDMAN LLP
*Attorneys for The Culture Project, Inc.*
New York, New York
  By: Joel Shafferman, Esq.
     Peter Frank, Esq.

ADAM LEITMAN BAILEY, P.C.
*Attorneys for SubCulture, LLC*
New York, New York
  By: Jeffrey R. Metz, Esq.
     William J. Geller, Esq.

ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK P.C.
*Attorneys for The Bertha Foundation*
New York, New York
  By: Lori A. Schwartz, Esq.

1

**MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

The above-captioned adversary proceeding relates to a sublease under which The Culture Project, Inc. leased a basement theater space to SubCulture, LLC. In a separate motion, Culture Project has also sought an order directing SubCulture to pay "use and occupancy" payments to Culture Project beginning August 2016 or, in the alternative, permitting Culture Project to reject the sublease under section 365 of the Bankruptcy Code. SubCulture moved for a dismissal of some, but not all, of the claims asserted in the adversary proceeding, and it opposed the motion seeking use and occupancy payments. It also argued that a rejection of the sublease would have no practical effect because SubCulture would have the statutory right, following a rejection, to continue to occupy the space on the terms set forth in the sublease. *See* 11 U.S.C. § 365(h)(1).

The Court heard argument on the motion to dismiss in October 2016, after which the parties submitted additional briefs. The Court heard further argument in February 2017. Culture Project then filed an amended complaint in the adversary proceeding and submitted additional papers in support of its use and occupancy motion. SubCulture and Culture Project informed the Court on March 9, 2017 that they agreed that the original motion to dismiss should be deemed applicable to, and to have been renewed with respect to, the amended complaint.

Culture Project, SubCulture and the main landlord of the relevant theater spaces were involved in a protracted mediation that delayed some of the briefing on the foregoing motions and that prompted the Court to defer a ruling on the motions. However, the mediation did not succeed. By Order dated April 26, 2017 this Court denied the motion by Culture Project to assume the main lease. The deadline for assumption later passed, and as a result the main lease is deemed to have been rejected. *See* 11 U.S.C. § 365(d)(4). It is now appropriate to address the remaining motions.

**Pleading Standards**

In reviewing a motion to dismiss the court accepts the factual allegations of the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *E.E.O.C. v. Staten Island Sav. Bank*, 207 F.3d 144, 148 (2d Cir. 2000). However, the factual allegations in a complaint must be supported by more than mere conclusory statements. *Twombly*, 550 U.S. at 555. The allegations must "raise a right to relief above the speculative level" and provide more than a "formulaic recitation of the elements of a cause of action." *Id*. (citations omitted). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. at 678 (citations and internal quotation marks omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint is insufficient because it has merely "alleged" but not "show[n] … that the pleader is entitled to relief." *Id*. at 679.

Rule 7009 of the Federal Rules of Bankruptcy Procedure, which incorporates Rule 9(b) of the Federal Rules of Civil Procedure, imposes added requirements for fraud claims. "[I]n order to comply with Rule 9(b), 'the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir.2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d

Cir.1993)). While the alleged fraud must be stated with particularity, matters such as knowledge or intent may be alleged generally. *See* Fed. R. Civ. P. 9(b). Nevertheless, a plaintiff "'must allege facts that give rise to a strong inference of fraudulent intent.'" *Lerner*, 459 F.3d at 290 (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir.1995)).

Where (as here) the pleadings refer to agreements and other documents, it is proper for the Court to consider the documents as part of the pleadings in ruling on motions to dismiss. *Grant v. County of Erie*, 542 Fed. Appx. 21, 23 (2d Cir. 2013); *Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d. Cir. 2000); *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991). If an allegation is belied by the terms of the documents, the documents are controlling. *Id.; see also Alexander v. Board of Education of City of New York*, No. 15-1959, 2016 WL 2610009 (2d Cir. May 6, 2016) (summary order dismissing complaint where documents contradicted allegations).

### Culture Project's Allegations

Culture Project is a not-for-profit corporation. It supports and produces theatrical performances intended to contribute to a "civil and just society." In 2000, Culture Project entered into a lease with Rogers Investments NV, L.P. covering space at 45-49 Bleecker Street in New York City. Culture Project then constructed two theater spaces at the premises: one located on the first floor, and the other located in the basement level. Culture Project used the spaces for its own theater productions and also licensed performance space to third-party producers. Culture Project entered into a new lease with the landlord in April 2012.

In February 2012 Culture Project was approached by Mr. Anthony Tabatznik, who wished to discuss a possible sublease of the basement theater space. After discussions, Culture Project entered into an agreement with The Bertha Foundation, with which Mr. Tabatznik was

4

associated. The agreement provided that Bertha would provide a grant of $800,000 "towards rental of the building that houses The Culture Project," and that Bertha would be given the exclusive right to use the basement space for itself or for projects that it approved. The agreement was deemed effective "as of July 10, 2012" and was to run through July 2017. Bertha agreed to pay $400,000 immediately, with the remaining $400,000 to be disbursed in $50,000 increments each January and July from 2014 through 2017.

Subsequently, in December 2012, Culture Project entered into the sublease with SubCulture. Section 1 of the sublease grants SubCulture "an irrevocable sublease to exclusively occupy and use the basement of the Premises and, in addition, the non-exclusive right" to use certain additional areas of the premises. Section 1 further stated:

> Culture Project acknowledges and agrees that SubCulture shall be the deemed designee to facilitate and execute projects approved by The Bertha Foundation (the "**Foundation**") for purposes of having the right to the exclusive use of the basement of the Premises under that certain Grant Agreement dated July 10, 2012 between the Foundation and Culture Project.

The sublease term continued until the later of (i) the fifth anniversary of the first day of the sublease term, or (ii) the end of the First Renewal Term under the main lease.

SubCulture paid the sum of one dollar ($1) in consideration for the sublease. It had the right to extend the sublease if Culture Project exercised its rights to a Second Renewal Term under the main lease, but in that case SubCulture and Culture Project were to "negotiate in good faith" to determine the rent payable by SubCulture for that additional Second Renewal Term. SubCulture had to arrange and pay for certain services (*e.g.*, electricity to the basement, telephone); it had to pay its own expenses for permits, licenses and operation of the box office; and it had to make payments to Culture Project regarding certain utilities and shared services. However, with the exception of payment obligations that were expressly set forth in the sublease, the parties agreed that SubCulture would "have no obligation to make any payments to Culture

5

Project or the Landlord for the rights granted to and provided for SubCulture under this Agreement." Culture Project agreed that it would "make timely payment to the Landlord of all the rent obligations under Article 3 of the Lease."

Section 17 set forth the following remedies in the event of a default by SubCulture:

> In the event (a) SubCulture fails to perform any material term of this Agreement to be observed or performed by SubCulture, which failure is not cured within thirty (30) days after written notice of such default by Culture Project, (b) SubCulture shall become bankrupt or insolvent, or (c) any petition shall be filed by or against SubCulture in any bankruptcy, reorganization, composition, extension, arrangement, or insolvency proceedings, or *[sic]* then Culture Project shall be entitled to all rights and remedies available at law or in equity.

Finally, section 29 of the sublease confirmed that "[t]his Agreement constitutes the sole and only agreement between Culture Project and SubCulture regarding the Premises. Any agreements or representations respecting the Premises, or their subleasing by Culture Project to SubCulture, not expressly set forth herein are null and void."

Bertha made the initial $400,000 payment and the $50,000 payment that was due in early 2014. However, it made no further payments to Culture Project. Culture Project alleges that Bertha's failure to make payments was a default under the sublease. It also alleges that SubCulture failed to pay invoices for property taxes, utilities, sanitation, trash removal and box office expenses, and that SubCulture's use of the premises, and renovations that it made, were in violation of the terms of the sublease.

By letter dated December 8, 2014, Culture Project purported to terminate the sublease. The letter stated:

> You have previously received written notices pursuant to Paragraph 17 of the Sublease Agreement of your default and failure to perform material terms of the Sublease Agreement including failure to pay invoices due to Culture Project in the amount of $171,151.58, all of which is due immediately.

6

> You have failed to correct the failures and deficiencies stated in those notices, and, as a result, by this letter Culture Project declares this Sublease to be terminated as of December 12, 2015. Pursuant to paragraph '12' of the Sublease, you have until January 11, 2015 to remove your property, to repair any damages and to yield up the Subleased Area in accordance with the Sublease.

In context it appears that the December 8, 2014 letter intended to terminate the sublease effective January 12, 2015, but by its terms it referenced a termination effective "December 12, 2015."

Culture Project did not take further legal action in December 2014 or January 2015. The parties continued to negotiate for the next 18 months in an effort to reach an agreement, but they did not resolve the outstanding issues. By letter dated May 21, 2016, Culture Project renewed its demand that SubCulture vacate the subleased space. SubCulture did not vacate the space and it continued to pay no rent throughout the period that ended with Culture Project's deemed rejection of the main lease in April 2017.

**The Asserted Claims and the Pending Motions**

The amended complaint alleges seven causes of action against SubCulture and Bertha, but two of the claims are denominated "Count 3." The first "Count 3" is asserted against SubCulture, and the second "Count 3" is asserted only against Bertha. The Court will treat the claim against Bertha that was denominated as Count 3 as "Count 3A" to avoid confusion.

Counts 1, 2 and 3 of the amended complaint allege breaches of the Bertha agreement and of the sublease. Count 1 alleges that Bertha breached its grant agreement with Culture Project and that as a consequence Culture Project was entitled to, and did, terminate the sublease with SubCulture. It further alleges that "[b]y not making the said payments which granted Bertha with exclusive use of the basement, SubCulture effectively and unlawfully occupied space at the Premises." Count 2 similarly alleges that Bertha's assignment of its rights to SubCulture gave SubCulture the right to cure Bertha's defaults, but that SubCulture failed to do so, as a result of

7

which the agreement with Bertha, and the sublease with SubCulture, should be deemed void and of no effect. Finally, Count 3 alleges that SubCulture failed to make certain payments and breached other obligations it owed under the sublease, and again alleges that SubCulture unlawfully occupied space following a termination of the sublease.

Counts 3A and 4 allege fraud. Count 3A alleges that Bertha committed fraud in the inducement by representing that it would make the payments set forth in the grant agreement but withholding information about its true intention not to make the payments. Count 4 alleges fraud in the inducement by SubCulture; those allegations are described more fully below.

Count 5 alleges that Culture Project is entitled to "injunctive and equitable relief" against SubCulture by reason of SubCulture's breaches of its agreements, including an order directing SubCulture to pay at least $20,000 per month for use and occupation charges from and after the date on which Culture Project purported to terminate the sublease. Finally, Count 6 of the amended complaint alleges that SubCulture has been unjustly enriched by using and occupying the subleased space without paying rent.

Culture Project also filed a separate motion to compel the payment of use and occupancy payments from and after August 2016 or, in the alternative, for permission to reject the sublease pursuant to section 365 of the Bankruptcy Code. The portion of the motion that sought use and occupancy payments was premised on the same claims and arguments asserted in the adversary proceeding and effectively sought relief on an interim basis pending a final resolution of the claims that were asserted in the adversary proceeding.

Bertha filed an answer and did not move to dismiss any of the claims against it. SubCulture has agreed that those portions of the amended complaint that allege that SubCulture breached obligations to pay taxes, utilities or other sums owed to Culture Project, or that allege

8

that SubCulture breached other obligations relating to the renovation or use of the space, state cognizable claims, though SubCulture disputes their merit. However, SubCulture moves to dismiss the amended complaint to the extent that it alleges that the sublease was terminated, arguing that the sublease is "irrevocable" and that New York law does not permit an early termination of a sublease unless such a termination right is expressly set forth in the sublease. SubCulture also argues that even if termination were permitted, the purported December 2014 termination notice became stale and unenforceable due to long delays, and that Culture Project did not provide a sufficient opportunity to cure defaults prior to termination. SubCulture further moves to dismiss the fraud claim, arguing that it fails to comply with Rule 9(b) and that it seeks relief that is duplicative of the contract claims. Finally, SubCulture moves to dismiss any equitable claims or unjust enrichment claims that seek "use and occupancy" payments on the ground that the sublease was never terminated and the sublease requires no such payments.

SubCulture has opposed the motion to compel immediate use and occupancy payments on the same grounds. It also opposed the motion for permission to reject the sublease, arguing (among other things) that a rejection would be ineffective because SubCulture would retain the statutory right to occupy the premises, on the terms of the sublease, following any such rejection.

### Jurisdiction and Ability to Render a Final Decision

Culture Project alleges that this Court has "core" jurisdiction over the asserted claims, and it has also consented to a final decision by this Court. SubCulture argues that the Court only has jurisdiction to the extent that the asserted claims are "related to" the pending bankruptcy case, and it does not consent to a final determination by this Court.

The Court has jurisdiction over civil proceedings that arise "under" the Bankruptcy Code or that "arise in" or are "related to" cases under the Bankruptcy Code. *See* 28 U.S.C. §§ 157,

9

1334. The motion for permission to reject the sublease arises "under" section 365 of the Bankruptcy Code, and this Court has power to render a final decision with respect to that portion of the motion. However, the other claims are not based on any provision in the Bankruptcy Code and do not arise "under" the Bankruptcy Code. They merely assert state law claims based on the alleged pre-bankruptcy termination of the sublease or other pre-bankruptcy events.

Matters may "arise in" a bankruptcy case if they "are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." *Elliott v. GM LLC (In re Motors Liquidation Co.)*, Nos. 15-2844-bk(L), 15-2847-bk(XAP), 15-284-bk(XAP), 2016 WL 3766237, at *10 (2d Cir. July 13, 2016) (citing *Baker v. Simpson*, 613 F.3d 346, 351 (2d Cir. 2010)). Here, however, the asserted claims are state law claims that plainly would have existed, in the same form, if Culture Project had not filed its bankruptcy petition.

Accordingly, the Court has jurisdiction over the adversary proceeding and the use and occupancy motion only to the extent they are "related to" the pending bankruptcy case. Generally, "a civil proceeding is related to a title 11 case if the action's outcome might have any conceivable effect on the bankrupt estate." *Residential Funding Co., LLC v. UBS Real Estate Secs. (In re Residential Capital, LLC)*, 515 B.R. 52, 63 n.12 (Bankr. S.D.N.Y. 2014) (citing *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011)). That standard plainly is satisfied here.

Section 157 of title 28 of the United States Code provides that the Court may not issue final decisions in matters that are "related to" bankruptcy cases unless the parties consent. 28 U.S.C. § 157(c)(2). The United States Constitution imposes limits on this Court's powers that are independent of the limits in section 157(c)(2), though these limits can also be waived with the parties' explicit consent. *See Stern v. Marshall*, 564 U.S. 462, 482 (2011); *Wellness*

10

*International Network, Ltd., et al. v. Sharif*, 575 U.S. __, 575 S. Ct. 1932, 1944-46 (2015). SubCulture has not consented to a final determination. Any final judgment in this adversary proceeding therefore will eventually require entry of proposed findings of fact and conclusions of law that will be subject to objection and to district court review. *See* 28 U.S.C. § 157(c)(1); Fed. R. Bankr. P. 9033. However, the pending motion to dismiss applies only to some (not all) of the asserted claims, and applies only to claims asserted against one defendant. A ruling on the motion is therefore an interlocutory ruling and not a final judgment. *See In re Trinsum Group, Inc.*, 467 B.R. 734 (Bankr. S.D.N.Y. 2012). This Memorandum Decision will be incorporated into the Court's findings of fact and conclusions of law if and when a final judgment is entered.

## Discussion

### I. The Sublease Was Not Terminated

The sublease itself does not contain a termination provision, although it does state generally that in the event of a default Culture Project may exercise any remedy at law or equity. SubCulture argues that under New York law a lease (or sublease) may not be terminated unless such a termination right is set forth in the lease itself, and that as a result the remedies to which Culture Project may be entitled do not include a termination of the sublease.

There was some confusion, during the briefing of this issue, over the fact that the New York courts often need to resolve issues as to whether a termination provision in a lease is a "conditional limitation" or a "condition subsequent," because that issue determines whether a case is a "holdover" proceeding in which the Civil Court has jurisdiction or whether it is a plenary action for "ejectment" that must be commenced in the Supreme Court. *See*, *e.g. Fourth Housing Co. v. Bowers*, 39 N.Y.S.3d 350, 351 (App.Term 2016). Here, however, the issue is a different one. The question before this Court is the more general one of whether a sublease may

11

be terminated at all, given that the sublease is "irrevocable" and does not contain any provision that explicitly provides for a termination, either as a remedy for a default or otherwise.

The Court directed the parties to submit additional authorities on this issue. In particular, it provided Culture Project with multiple opportunities to submit authorities in support of its contention that New York law permits a lessor to terminate a lease based on a default even if the lease itself does not include a termination or forfeiture provision. However, Culture Project submitted no such authorities. On the other hand, SubCulture has cited a number of New York decisions holding that, in the absence of a termination provision in the lease itself, the lessor is left only with its other rights under law and may not terminate the lease. *See, e.g., Gonzalez v. Peterson*, 177 Misc. 2d 940, 941, 678 N.Y.S.2d 855, 856 (App. Term 1998), *aff'd sub nom. Dass-Gonzalez v. Peterson*, 258 A.D.2d 298, 685 N.Y.S.2d 197 (1st Dep't 1999). This appears to be a correct statement of New York law. *See Lake Anne Realty Corp. v. Sibley*, 545 N.Y.S.2d 828, 829-30 (App. Div. 1989) (noting that the relevant lease did not include an express provision for termination or forfeiture in the event of a breach of a covenant and holding that it is "well settled" that absence such an express stipulation "the breach of a covenant in a lease generally does not work a forfeiture of the lease term"); *Michels v. Fishel*, 169 N.Y. 381, 389 (1902) (in the absence of a termination or forfeiture provision, a lessor's only remedy for breach of a covenant is "an action on the covenant"); *Cohen v. Carpenter*, 113 N.Y.S. 168 (App. Div. 1908) (same); 74 N.Y. Jur. 2d, *Landlord and Tenant*, § 887 ("absent an express stipulation for a forfeiture the breach of a covenant in a lease does not work a forfeiture of the term"); *id.* § 888 (noting that "the nonpayment of rent does not operate as a forfeiture of the term or confer upon the lessor any right of reentry in the absence of a provision in the lease allowing such or of a statute so declaring.").

12

Culture Project argues that the sublease entitled it to pursue "all" available remedies for a default and that "all" remedies should include a termination right. However, under the above authorities it does not appear that a New York court could or would have ordered a termination of the sublease as a "remedy," even if it had found that SubCulture had breached the sublease. Instead, it appears that the "remedies" that are generally available at law and equity do not include "termination" unless that right is set forth expressly in the sublease.

Moreover, even if a state court would have had the power to terminate the sublease as a "remedy" in an action brought by Culture Project, that termination by court order would have been effective only from and after the entry of such an order. Here, Culture Project filed no state court litigation, and it obtained no such "remedy" from any court. Instead, Culture Project purported to effect a termination of the sublease based on a notice that it sent to SubCulture. That notice was ineffective because the sublease did not provide Culture Project with such a termination right.

During argument, Culture Project pointed to a provision in section 22 of the sublease that states that SubCulture is bound by all of the terms of the main lease, and that "[a] copy of the terms and provisions of the Lease shall be deemed incorporated herein and deemed a part hereof." The main lease included a provision that entitled the main landlord to terminate the main lease if Culture Project committed certain defaults. Culture Project argued that the incorporation of this provision into the sublease should be interpreted as a grant, to Culture Project, of a termination right based on a default by SubCulture. However, the main lease only gave termination rights to the main landlord. There is nothing in the main lease that allows Culture Project to terminate a sublease based on an alleged default by the sublessee, and so the incorporation of the main lease did not give such rights to Culture Project.

Culture Project has also argued that the agreement with Bertha and the sublease with SubCulture should be treated as a single agreement and that SubCulture's occupancy rights should be treated as though they were dependent upon Bertha's compliance with Bertha's obligations under the grant agreement. However, the Bertha agreement also contains no provision that would authorize a termination of occupancy in the event of a default by Bertha. Accordingly, there would be no basis for a finding that the sublease had been terminated, even if the Court were to treat the Bertha agreement and the sublease as a single agreement.

Furthermore, the terms of the sublease make clear that the Bertha agreement and the sublease are independent obligations.

<u>First</u>, the sublease very clearly states that SubCulture has no obligation to make any payments for the rights granted in the sublease except as set forth in the sublease itself. There are no provisions in the sublease that require rental payments by SubCulture, or that require SubCulture to make payments in the event that Bertha fails to do so.

<u>Second</u>, the sublease disclaims any contention that the Bertha grant agreement, and the sublease, are part of a single agreement. It states that the sublease itself constitutes the full agreement of the parties with respect to SubCulture's rights.

<u>Third</u>, the sublease contains no provision that could reasonably be interpreted as conditioning SubCulture's occupancy on Bertha's compliance with its obligations under the grant agreement. The sublease acknowledges that SubCulture is to be treated as the assignee of Bertha's occupancy rights, but that is all. There is no requirement that Bertha perform its obligations in order for SubCulture to enforce its sublease rights. To the contrary: the sublease was described as "irrevocable."

14

The parties could have tied SubCulture's rights to Bertha's performance if they had so desired. However, they did not do so. The Court's job is to enforce the agreement that the parties made, not to rewrite its terms. The merger clause, the explicit disclaimer of any payment obligation by SubCulture, and the grant of an "irrevocable" sublease make clear that any remedy Culture Project might have for a breach by Bertha is an action against Bertha itself.

Termination of the sublease was not an automatic consequence of a default under the sublease or a default by Bertha, and it was not an optional right that Culture Project was entitled to invoke if and when a default occurred, whether by SubCulture or Bertha. Accordingly, the notices sent by Culture Project could not, and did not, terminate the sublease. No other event occurred that effected such a termination, and so the claims in the amended complaint that are premised on the notion that the sublease was terminated must be dismissed. In light of this decision, it is not necessary to consider SubCulture's contentions that the January 2014 termination notice became stale and unenforceable, or that a termination would have required a better opportunity to cure defaults.

The dismissal of the contentions that the sublease was "terminated" does not affect those portions of the amended complaint that allege that SubCulture breached the terms of the sublease by failing to make payments that were due from SubCulture, and those portions of the amended complaint that seek damages or other relief (excluding termination) based on those alleged breaches. SubCulture has acknowledged that those allegations state cognizable claims.

## II.    The Fraud Claims are Deficient and Should Be Dismissed

In October 2016 the Court advised Culture Project that the allegations in the original complaint were not sufficiently specific to comply with the requirements of Rule 9, in that (among other things) they did not specify who made misrepresentations, what the

15

misrepresentations were, when they were made, to whom they were made, the manner in which they were made, and that they were made with knowledge of their falsity and with an intention to defraud Culture Project. The amended complaint represents Culture Project's effort to provide more specific allegations. The revised allegations are as follows:

> 63. The promised remittance of eight $50,000 USD payments over four years by Bertha was a material inducement for the Plaintiff to enter into the Sublease with SubCulture.
>
> 64. During the negotiations of the Sublease in which exclusive rights to the Subleased Area was granted to SubCulture, as designee of Bertha Foundation, SubCulture made promises with a preconceived and undisclosed intention of not keeping them. Such promises included its commitment to use the Subleased Area for events and performances that would be consistent with the Debtor's mission to contribute to the betterment of a civil and just society.
>
> 65. However, upon its taking possession of the basement space, SubCulture began its surreptitious efforts to convert the basement space into a venue where it would hold entertainment events, directed primarily for profit making purposes, and corporate events and parties.
>
> 66. As a result of the inseparable and holistic nature of the Agreement and Sublease, SubCulture affirmatively represented that Bertha would pay an additional $400,000 USD to Culture Project beginning January 2014, and Culture Project reasonably relied upon such representation.
>
> 67. SubCulture additionally affirmatively represented that it would pay invoices due to Plaintiff for property taxes, utilities, sanitation, trash removal, and box office expenses.
>
> 68. SubCulture deceived the Plaintiff by withholding material information about Bertha Foundation's and SubCulture's intention to make payments, thereby restricting the ability of the Plaintiff to otherwise rent the space to a paying subtenant.
>
> 69. By failing to disclose Bertha's intention not to make the final $400,000 in payments and SubCulture's intent to not make the contractual payments, SubCulture made misrepresentations of present fact, upon which the Plaintiff reasonably relied, which fraudulently induced the Plaintiff to enter into the Sublease, dated December 13, 2012.

16

Most of the foregoing allegations relate to alleged misrepresentations about SubCulture's intent to perform its own obligations under the sublease. In order to state a claim of fraudulent inducement (as opposed to a claim for breach of contract), however, Culture Project was obligated to identify fraudulent misrepresentations made by SubCulture that were separate from the contractual promises made in the sublease itself and that induced Culture Project to make the contract. *See Weisblum v. Prophase Labs, Inc.,* 88 F. Supp. 3d 283, 298 (S.D.N.Y. Feb. 20, 2015). Culture Project has not done so. It has merely alleged in a general way that SubCulture made contractual promises without an intent to perform them, which is not sufficient to state a claim of fraudulent inducement. *New York University v. Continental Ins. Co.*, 87 N.Y.2d 308, 318 (1995); *Telecom Int'l Am., Ltd. v. AT&T Corp.*, 280 F.3d 175, 196 (2d Cir. 2001).

Some of the allegations set forth above relate to Bertha's intentions to perform Bertha's obligations. However, the amended complaint has not identified any specific statement that SubCulture or its representatives ever made on this subject. Instead of factual allegations, the amended complaint makes an argument that "[a]s a result of the inseparable nature of the [Bertha] Agreement and the Sublease, SubCulture affirmatively represented that [the Foundation] would pay . . . ." That allegation does not make sense. Just because SubCulture entered into a sublease does not mean that it made a false representation about Bertha's intentions, or any representation at all about Bertha. In fact, there is still no allegation in the amended complaint that SubCulture actually knew of any alleged intent by Bertha to renege on its obligations.

These allegations are not sufficient to state a claim of fraud. Therefore, the Count against SubCulture alleging fraud in the inducement should be dismissed. However, if discovery that is taken in connection with the remaining claims provides a basis for the renewal of the fraud

17

claims against SubCulture, or for a claim that SubCulture conspired with Bertha in an actionable way, the Court will allow a motion at that time for reinstatement of the fraud claim against SubCulture or for other appropriate amendments to the pleadings. In that regard, then, the dismissal of the count for fraud in the inducement as against SubCulture will be a dismissal without prejudice.

### III.   Counts 5 and 6 Are Deficient and Should Be Dismissed.

The Claim that is labeled Count 5 (which seeks use and occupancy payments as a form of equitable relief against SubCulture) must be dismissed. The sublease makes clear that no such payments are due. The Court cannot modify the written terms of the sublease in the guise of granting "equitable" relief. To the extent that count 5 is premised on the notion that the sublease was terminated, the claim is deficient for the reasons stated above. The interim motion to compel use and occupancy payments must be denied for the same reasons.

The claim that is labeled count 6 (unjust enrichment) also must be dismissed. SubCulture has rights pursuant to its sublease. A claim for unjust enrichment cannot be asserted where there is an agreement that governs the parties' rights, and the sublease is such an agreement. *See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987) (under New York law a claim for unjust enrichment may not be asserted with respect to transactions that are governed by contracts).

### IV.   The Motion to Reject the Sublease is Denied

In August 2016, Culture Project sought permission to reject the sublease, on the theory that such a rejection would end SubCulture's occupancy rights and would entitle Culture Project to demand rent payments, or use and occupancy charges, going forward. However, a rejection would not have had that effect. Section 365(h)(1) of the Bankruptcy Code provides that if a

debtor rejects a lease under which the debtor is the lessor, the lessee has the option of remaining in the space on the terms set forth in the rejected lease.

It is not clear whether Culture Project continues to seek permission to reject the sublease, as that portion of its original motion has not been mentioned in the subsequent papers that were filed. The deemed rejection of the main lease, in April 2017, also deprives Culture Project of any occupancy rights that it once had and therefore renders moot any effort by Culture Project to collect "use and occupancy" charges from SubCulture periods after April 2017. SubCulture may have other rights to retain its occupancy rights or even to take over the tenant's rights under the main lease, based in part on its separate agreements with the landlord; those rights will be determined in a separate litigation between SubCulture and the landlord in the New York state court. However, Culture Project itself no longer has a stake in the occupancy of the premises or any ongoing right to demand occupancy payments from SubCulture.

The motion is therefore denied to the extent it seeks to reject the sublease, on the ground that such rejection would have no practical consequence and would serve no legitimate business purpose of the estate.

## Conclusion

For the foregoing reasons, the motion to reject the sublease is denied. Counts 1, 2 and 3 will be dismissed with prejudice to the extent that they claim that the sublease between Culture Project and SubCulture was terminated based upon alleged defaults under either the Bertha agreement or the sublease. Counts 5 and 6 will be dismissed, with prejudice, in their entirety. Count 4 will be dismissed without prejudice. For the avoidance of doubt, there was no motion to dismiss those portions of Counts 1, 2 and 3 that allege that SubCulture breached the terms of the sublease and that seek damages or other relief (excluding termination) based on those alleged

breaches, and those claims may proceed.  A separate Order will be issued to incorporate these

rulings.

Dated: New York, New York
      July 11, 2017

                                  **s/Michael E. Wiles**
                                  **Honorable Michael E. Wiles**
                                  **United States Bankruptcy Judge**